# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK PASSUT, *et al.*

        *Plaintiffs*,

    vs.

BETSY DEVOS, in her official capacity as
U.S. Secretary of Education, *et al.*

        *Defendants.*

Case No. 1:19-cv-1606 (RBW)

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Background ......................................................................................................... 3

    A.    Statutory and regulatory background ............................................. 3

    B.    Factual background ........................................................................ 6

        1.    ACICS's recognition proceedings ................................... 6

        2.    The Court's remand and DeVos's April 2018 Order .................... 7

        3.    The collapse of Virginia College ................................... 9

    C.    Proceedings in this Court ............................................................ 10

Legal Standard .................................................................................................. 11

Argument .......................................................................................................... 12

    I.    Defendants' threshold objections are meritless. .................................. 12

    A.    Plaintiffs were injured by the April 2018 Order. ...................... 12

        1.    Plaintiffs adequately allege that they were injured by taking out loans that the Department could not lawfully issue. .................... 12

        2.    Defendants inappropriately rely on materials outside the record to challenge Plaintiffs' standing. ........................................................ 14

        3.    The closure of Virginia College prevented Plaintiffs from completing their credits. ........................................................ 18

    B.    The Court can and should provide a remedy for Plaintiffs' injuries. ........ 22

    C.    The April 2018 Order was final agency action. ...................... 27

    II.    The April 2018 Order exceeded Defendants' authority under the governing statutes and regulations. ............................................................ 30

Conclusion ........................................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\* *ACICS v. DeVos*,
    303 F. Supp. 3d 77 (D.D.C. 2018) .................................................................. *passim*

\* *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    429 F.3d 1136 (D.C. Cir. 2005) ........................................................................34

*Akers v. Liberty Mut. Grp.*,
    744 F. Supp. 2d 92 (D.D.C. 2010) ...................................................................16

*Am. Hosp. Ass'n v. Azar*,
    385 F. Supp. 3d 1 (D.D.C. 2019) .....................................................................34

*Armstrong v. Accrediting Council for Continuing Educ. & Training*,
    168 F.3d 1362 (D.C. Cir. 1999) ........................................................................26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................................11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................11

*Bennett v. Donovan*,
    703 F.3d 582 (D.C. Cir. 2013) ..........................................................................26

*Brown v. Plata*,
    563 U.S. 493 (2011) ..........................................................................................23

*Cheyenne Arapaho Tribes of Okla. v. United States*,
    558 F.3d 592 (D.C. Cir. 2009) ..........................................................................15

*Cigar Ass'n of Am. v. FDA*,
    315 F. Supp. 3d 143 (D.D.C. 2018) ..................................................................28

\* *Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017) ...................................................................27, 28, 29

*Coal. for Common Sense in Gov't Procurement v. United States*,
    671 F. Supp. 2d 48 (D.D.C. 2009) ...................................................................24

*CSI Aviation Servs., Inc. v. Dep't of Transp.*,
    637 F.3d 408 (D.C. Cir. 2011) ..........................................................................30

*Cutler v. HHS*,
    797 F.3d 1173 (D.C. Cir. 2015) ........................................................................22

*Ehrman v. United States*,
    429 F. Supp. 2d 61 (D.D.C. 2006) ....................................................................39

*Elzeneiny v. District of Columbia*,
    125 F. Supp. 3d 18 (D.D.C. 2015) ....................................................................15

*Feldman v. Fed. Deposit Ins. Corp.*,
    879 F.3d 347 (D.C. Cir. 2018) ..........................................................................12

*Fla. Audubon Soc. v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) ............................................................................22

*Food & Water Watch v. EPA*,
    5 F. Supp. 3d 62 (D.D.C. 2013) ........................................................................29

*Friedman v. FAA*,
    841 F.3d 537 (D.C. Cir. 2016) ....................................................................28, 30

*Friends of the Capital Crescent Trail v. Fed. Transit Admin.*,
    218 F. Supp. 3d 53 (D.D.C. 2016) ....................................................................34

*FTC v. Standard Oil Co.*,
    449 U.S. 232 (1980) ..........................................................................................29

*Grell v. Trump*,
    330 F. Supp. 3d 311 (D.D.C. 2018) ..................................................................11

* *Hale v. United States*,
    2015 WL 7760161 (D.D.C. 2015) ....................................................................14

*Heartland Hosp. v. Thompson*,
    328 F. Supp. 2d 8 (D.D.C. 2004) ......................................................................34

* *Heartland Regional Medical Center v. Sebelius*,
    566 F.3d 193 (D.C Cir. 2009) ................................................................... *passim*

* *Herbert v. Nat'l Acad. of Scis.*,
    974 F.2d 192 (D.C. Cir. 1992) ..........................................................................14

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
    920 F.2d 960 (D.C. Cir. 1990) ....................................................................33, 34

*LaRoque v. Holder*,
    650 F.3d 777 (D.C. Cir. 2011) ..........................................................................22

*Londrigan v. FBI,*
    670 F.2d 1164 (D.C. Cir. 1981) ........................................................15, 18

*Lopes v. Jetsetdc, LLC,*
    4 F. Supp. 3d 238 (D.D.C. 2014) ............................................................15

*Massachusetts v. Nuclear Regulatory Comm'n,*
    924 F.2d 311 (D.C. Cir. 1991) .................................................................34

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) .................................................................23

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,*
    894 F.3d 95 (2d Cir. 2018)......................................................................28

* *Nat'l Wildlife Fed'n v. Espy,*
    45 F.3d 1337 (9th Cir. 1995) .............................................................23, 24

*Nat'l Women's Law Ctr. v. OMB,*
    358 F. Supp. 3d 66 (D.D.C. 2019) ...........................................................28

*Nebraska Dep't of Health & Human Servs. v. HHS,*
    435 F.3d 326 (D.C. Cir. 2006) .................................................................32

*Palisades General Hosp. v. Leavitt,*
    426 F.3d 400 (D.C. Cir. 2005) .................................................................25

*Pineros y Campesinos Unidos del Noroeste v. Pruitt,*
    293 F. Supp. 3d 1062 (N.D. Cal. 2018) ....................................................28

* *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. &*
    *Colls.,*
    781 F.3d 161 (4th Cir. 2015) ........................................................4, 23, 37

*Pub. Citizen, Inc. v. Trump,*
    361 F. Supp. 3d 60 (D.D.C. 2019) ...........................................................18

*Reed v. Salazar,*
    744 F. Supp. 2d 98 (D.D.C. 2010) ...........................................................24

*Salazar v. King,*
    822 F.3d 61 (2d Cir. 2016).......................................................................30

*Select Specialty Hosp. of Atlanta v. Thompson,*
    292 F. Supp. 2d 57 (D.D.C. 2003) ...........................................................38

*Smith v. Dalton,*
    927 F. Supp. 1 (D.D.C. 1996) ..................................................................39

*Southwest Airlines v. Dep't of Transp.,*
  832 F.3d 270 (D.C. Cir. 2016) ..................................................................................29

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  280 F. Supp. 3d 187 (D.D.C. 2017) ..........................................................................25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  282 F. Supp. 3d 91 (D.D.C. 2017) ............................................................................34

* *Texas Children's Hosp. v. Burwell,*
  76 F. Supp. 3d 224 (D.D.C. 2014) ............................................................................24

* *U.S. Sugar Corp. v. EPA,*
  830 F.3d 579 (D.C. Cir. 2016) ..................................................................................34

**Statutes, Regulations, and Rules**

5 U.S.C. § 706 ..............................................................................................................22, 39

20 U.S.C.
  § 1070 .............................................................................................................................3
  § 1087 ...........................................................................................................................23
  § 1091 ...........................................................................................................................13
  § 1099b ...........................................................................................................................4
  § 1099c .....................................................................................................................5, 13

31 U.S.C. § 3720A ............................................................................................................26

31 C.F.R.
  § 285.2 ..........................................................................................................................26
  § 285.4 ..........................................................................................................................26
  § 285.5 ..........................................................................................................................26

34 C.F.R.
  § 30.1 ............................................................................................................................26
  § 30.33 ..........................................................................................................................26
  § 99.31 ..........................................................................................................................18
  § 99.35 ..........................................................................................................................18
  § 600.5 ..........................................................................................................................13
  § 602.1 .......................................................................................................................3, 4
  § 602.15 ..........................................................................................................................5
  § 602.16 ..........................................................................................................................5
  § 602.17 ..........................................................................................................................5
  § 602.18 ..........................................................................................................................5
  § 602.19 ..........................................................................................................................5
  § 602.20 ..........................................................................................................................5
  § 602.21 ..........................................................................................................................5
  § 602.22 ..........................................................................................................................5

§ 602.31............................................................................................................4
§ 602.32............................................................................................................4
§ 602.34............................................................................................................4
§ 602.36.........................................................................................................4, 5
§ 602.37.............................................................................................4, 9, 10, 39
§ 602.38..........................................................................................................37
§ 685.206.........................................................................................................27

Fed. R. Civ. P. 56.............................................................................................15

Fed. R. Evid.
  803..........................................................................................................16, 17
  902..........................................................................................................16, 17

## Other Authorities

59 Fed. Reg. 22,250 (Apr. 29, 1994) ................................................................3

Alexandra Hegji, Cong. Research Serv., R43826, An Overview of Accreditation
    of Higher Education in the United States (Mar. 23, 2017),
    https://fas.org/sgp/crs/misc/R43826.pdf ..............................................4

In re ACICS, Docket No. 16-44-O (Dec. 12, 2016),
    https://www2.ed.gov/documents/acics/final-acics-decision.pdf.................... passim

Letter from Lynn B. Mahaffie, Acting Ass't Sec'y for Postsecondary Educ., to
    Colleagues (Dec. 12, 2016), https://ifap.ed.gov/eannouncements/attachments/
    121316LetterToACICS InstitutionsAccredited.pdf.................................5

Order, ACICS, Docket No. 16-44-O (Apr. 3, 2018),
    https://web.archive.org/web/20190111153907/
    https://www2.ed.gov/documents/press-releases/acics-docketno-16-44-0.pdf.........9

William S. Jordan, III, Ossification Revisited: Does Arbitrary and Capricious
    Review Significantly Interfere with Agency Ability to Achieve Regulatory
    Goals Through Informal Rulemaking?, 94 Nw. U. L. Rev. 393 (2000)..................33

# INTRODUCTION

The Accrediting Council for Independent Colleges and Schools, or ACICS, has long been the nation's leading accreditor of struggling and failed for-profit colleges. In December 2016, the Department of Education—after a year-long process that involved multiple steps of Department review and thousands of pages of evidence—found that ACICS had neglected its responsibilities to students, and therefore terminated ACICS's recognition. In March 2018, the Court remanded that decision to the Department so that the Department could consider additional evidence submitted by ACICS late in the recognition process. But the Court did not vacate that decision, which meant that it should have remained in effect while the Department examined the new evidence. Nevertheless, Secretary of Education Betsy DeVos immediately and unlawfully reinstated ACICS's recognition, allowing the Department to issue loans for payment to schools accredited only by ACICS.

The all-too-predictable result? One of the failing chains accredited by ACICS, the Education Corporation of America, including its Virginia College brand, collapsed within the year—leaving many of its students with thousands of dollars in debt. Plaintiffs Mark Passut and Mark Kaiser, former students of Virginia College, filed suit to challenge Secretary DeVos's decision. They incurred substantial debt to the Department to attend Virginia College for the Fall 2018 term, debt which could not have been issued but for the Department's unlawful reinstatement of ACICS. Secretary DeVos's decision violated the Administrative Procedure Act, and the loans Plaintiffs took out based on the Secretary's decision are null and void.

Rather than squarely defend that decision on the merits, however, the Department of Education—supposed champions for students—has chosen to malign *Plaintiffs* as being supposedly incapable of earning the academic credit that they borrowed money from the Department to pursue. Defendants have hauled out Plaintiffs' attendance reports and other

confidential school records to suggest that Plaintiffs were responsible for their own injuries. But Plaintiffs were injured by taking on debt to the government that they could not have incurred absent Defendants' unlawful actions, whether or not they were ultimately able to receive credit for the term. Also, Defendants have failed to adequately authenticate or support the records they rely on in their motion. Regardless, Defendants have utterly misinterpreted those records. Plaintiffs were delayed in completing their credits before the end of the term because they switched fieldwork assignments midway through—a decision Virginia College endorsed and represented would not prevent them from receiving credit. In other words, Plaintiffs would have been able to complete their credits but for the closure of Virginia College.

Defendants also try out a few other procedural bars. They assert that there is no remedy the Court can provide for their unlawful conduct. But the Court can provide several remedies sufficient to redress Plaintiffs' injuries: it can vacate Plaintiffs' loans, it can enjoin Defendants from continuing to collect on them, and it can declare that they are unenforceable. Defendants also argue that Secretary DeVos's decision did not constitute final agency action. But that decision conclusively permitted schools accredited by ACICS to continue receiving student loans during ACICS's recognition proceedings. Such action is quintessentially final and reviewable.

Turning, at last, to the merits, Defendants' arguments depend on asserting that the Court did something that it didn't. Defendants do not dispute that if the Court's decision did not vacate the Department's December 2016 Order, then Defendants had no authority to reinstate ACICS's recognition. By its terms, however, the Court's decision remanded the December 2016 Order without vacating it. The familiar *Allied-Signal* factors supported that decision: the Department could easily remedy its failure to consider ACICS's additional evidence and again terminate ACICS's recognition, and reinstating ACICS's recognition threatened to harm—and in fact *did*

2

harm—students, like Plaintiffs, who attended ACICS-accredited schools. Thus, the Court's previous decision should not be interpreted to have vacated the Department's December 2016 Order, and that Order should have remained in effect.

The bottom line is that by summarily reinstating a failed accreditor of for-profit colleges, Defendants favored the business interests of the accreditor and for-profit schools over the academic and financial needs of the students they are supposed to serve. In doing so, they violated the Administrative Procedure Act and harmed students nationwide—including Plaintiffs here. The Court should therefore deny Defendants' motion to dismiss.

## BACKGROUND

### A.    Statutory and regulatory background

Institutions of higher education have long been overseen by a so-called "triad" of entities: the federal Department of Education, state regulators, and private accrediting agencies. Responsibility is shared "among accrediting agencies, States, and the Federal government" to ensure that access to programs under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*, is only available "to those institutions that provide students with quality education or training worth the time, energy, and money they invest in it." Secretary's Procedures and Criteria for Recognition of Accrediting Agencies, 59 Fed. Reg. 22,250, 22,250 (Apr. 29, 1994).

As part of this regulatory scheme, the Department has established a mechanism for "recogniz[ing] accrediting agencies to ensure that these agencies are … reliable authorities regarding the quality of education or training offered by the institutions or programs they accredit." 34 C.F.R. § 602.1. Given that "the character and quality of [institutions'] programs can vary widely," accreditation helps to "ensure a level of acceptable quality across the wide array of

programs and institutions in higher education."[1] Most importantly for present purposes,

"[a]ccreditation … is a prerequisite to Title IV funding and it provides assurance that the federal

loans and grants are awarded to students who will get the education for which they are paying."

*Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161,

170 (4th Cir. 2015).

The process by which an accreditor can become federally recognized or extend its federal

recognition is laid out in 20 U.S.C. § 1099b and its implementing regulations, found at 34 C.F.R.

§§ 602.1 *et seq*. Briefly summarized, that process includes the following steps:

- An accreditor files an application for recognition and any supporting evidence with the Department. 34 C.F.R. § 602.31(a).

- The Department posts a notice of the application in the Federal Register and invites public comment. *Id.* § 602.32(a).

- The Department prepares a draft "staff report" recommending a disposition of the application, to which the accreditor is allowed to respond before the report is finalized. *Id.* § 602.32(f).

- The application, report, public comments, and other materials are submitted to an independent advisory committee, the National Advisory Committee on Institutional Quality and Integrity (NACIQI), which holds a public hearing to discuss the application and then provides its own recommendation. *Id.* § 602.34.

- Based on the submissions and recommendations, the "senior Department official," an official designated by the Secretary, renders a written decision on whether to recognize the accreditor. *Id.* § 602.36.

- If the senior Department official elects not to recognize the accreditor, the accreditor may appeal his or her decision to the Secretary, who conducts a de novo review of the entire record before making a final decision. *Id.* § 602.37(a)-(d).

The regulations also establish substantive criteria that an accreditor must meet to receive

recognition from the Department. *Id.* § 602.1(b). The most important of these require the

---

[1]    Alexandra Hegji, Cong. Research Serv., R43826, An Overview of Accreditation of Higher Education in the United States 1 (Mar. 23, 2017), https://fas.org/sgp/crs/misc/R43826.pdf.

accreditor to demonstrate that its standards are "sufficiently rigorous" to ensure that its accreditation decisions are a reliable barometer of institutional quality (*id.* § 602.16); that it has "effective mechanisms" for evaluating individual institutions (*id.* § 602.17); that it applies its standards consistently (*id.* § 602.18); that it sufficiently monitors the institutions it accredits (*id.* § 602.19); that it promptly initiates enforcement action against noncompliant institutions (*id.* § 602.20); and that it reviews its own standards on a regular basis (*id.* § 602.21). There are also criteria governing an accreditor's administrative and fiscal health (*id.* § 602.15) as well as its internal operating procedures (*id.* §§ 602.22-28).

Importantly, "if the [accrediting] agency either fails to comply with the criteria for recognition … , or to apply those criteria effectively, the senior Department official denies, limits, suspends, or terminates recognition." 34 C.F.R. § 602.36(e)(2)(i). Only if "the senior Department official concludes that the agency will demonstrate or achieve compliance with the criteria for recognition and effective application of those criteria within 12 months or less" can the official continue the agency's recognition, which is limited to 12 months absent "extraordinary circumstances." *Id.* § 602.36(e)(3). If the Secretary, or the senior Department official acting as the Secretary, "withdraws the recognition of any accrediting agency, … the Secretary may, notwithstanding the withdrawal, continue the eligibility of the institution[s] of higher education" accredited by that agency for federal student aid programs "for a period not to exceed 18 months from the date of the withdrawal of recognition." 20 U.S.C. § 1099c. "Institutions that fail to meet the statutory deadline … lose Title IV eligibility."[2]

---

[2]    Letter from Lynn B. Mahaffie, Acting Ass't Sec'y for Postsecondary Educ., to Colleagues 1 (Dec. 12, 2016), https://ifap.ed.gov/eannouncements/attachments/121316LetterToACICS InstitutionsAccredited.pdf.

B.    **Factual background**

1.    *ACICS's recognition proceedings*

In 2011, the Department granted five years of continued recognition to the Accrediting

Council for Independent Colleges and Schools. Am. Compl. ("AC") ¶ 24, ECF No. 14. By 2016,

however, it had become clear that ACICS was failing to meet federal standards and neglecting its

responsibilities to students at the schools that it accredited. According to a congressional report

released in 2016, ACICS accredited *seventeen* institutions accused of defrauding students—

*twelve* of which ACICS designated as "honor roll" campuses between 2010 and 2015. *Id.* ¶ 26.

That report also found that ACICS-accredited schools "consistently produce[d] astronomical

debt levels and terrible outcomes for students … measured by graduation rates, post-enrollment

earnings, and debt burdens." *Id.* In particular, ACICS continued to accredit a number of failing

institutions even as they were under state and federal investigation, and right up until they closed

or declared bankruptcy. *Id.* ¶ 28(a)-(d).

In January 2016, ACICS submitted an application for continued recognition. That

application was rejected at every level of review by the Department. In early 2016, the

Department staff formally recommended that the Department "[d]eny [ACICS's] petition for

renewal of recognition and withdraw the agency's recognition." *Id.* ¶ 31. The Department staff

found that ACICS failed to meet 21 recognition criteria and/or sub-criteria, including criteria

relating to job placement, licensing rates, and procedures for identifying and addressing at-risk

and failing institutions. *Id.* Following the Department staff's review, NACIQI conducted a

lengthy hearing on ACICS's petition, and ultimately "concurred with the staff recommendation"

*Id.* ¶ 32. In September 2016, the senior Department official agreed with NACIQI and the

Department staff, and thereby "terminat[ed] the Department's recognition of ACICS as a

nationally recognized accrediting agency." *Id.* ¶ 33. In doing so, she underscored that "ACICS's

track record does not inspire confidence that it can address all of the problems effectively," given

that many of them "are serious and long-standing." *Id.* ACICS then appealed that decision to the

Secretary of Education, who at the time was John King. *Id.* ¶ 34.

On December 12, the Secretary rejected ACICS's appeal. The Secretary found "ACICS

to be out of compliance with numerous regulatory criteria" and further concluded "that ACICS is

not capable of coming into compliance within 12 months or less" given "the nature and scope of

ACICS's pervasive noncompliance." Decision of the Sec'y at 1, Accrediting Agency

Recognition Proceeding, *In re ACICS*, Docket No. 16-44-O, (Dec. 12, 2016),

https://www2.ed.gov/documents/acics/final-acics-decision.pdf [hereinafter "December 2016

Order"]. He continued: "ACICS has exhibited a profound lack of compliance with the most basic

Title IV responsibilities of a nationally recognized accreditor," including by failing to "develop

and effectively implement a comprehensive scheme necessary to establish, apply, effectively

monitor, and enforce the required standards." *Id.* at 8. Indeed, as the Secretary noted, ACICS

never even attempted "to argue that it is in full compliance or that it should receive recognition

without condition." *Id.* at 4. The Secretary therefore issued a final decision terminating ACICS's

recognition. *Id.* at 14. As a result, schools accredited only by ACICS had 18 months—until June

12, 2018—to find a new accreditor or lose their eligibility to receive student loans. AC ¶¶ 36-37.

### 2.    *The Court's remand and DeVos's April 2018 Order*

Three days later, ACICS filed a lawsuit in this Court seeking to compel the Department

to restore its recognition. *See* Complaint, *ACICS v. DeVos*, No. 16-2448 (D.D.C. Dec. 15, 2016),

ECF No. 1. One of ACICS's challenges involved the Department's decision not to consider an

evidentiary submission relating to ACICS's compliance known as the "Part II submission,"

which the Department asserted had been submitted out-of-time by ACICS. Among other things,

ACICS asked the Court to "[v]acat[e] the Secretary of Education's decision to terminate

ACICS's recognition as an accreditation agency and further vacat[e] all related directives from the Secretary relating to the termination of ACICS's recognition," and to "[o]rder[] the Secretary of Education to return ACICS's Petition for recognition to the Department Staff for reconsideration." *Id.* at 27.[3]

On March 23, 2018, the Court concluded that the Department erred in declining to consider the Part II Submission and other evidence about ACICS's procedures and remanded the recognition decision to the Department so that it could consider that evidence in the first instance. *See ACICS v. DeVos*, 303 F. Supp. 3d 77, 102-08, 112-15 (D.D.C. 2018). At the same time, the Court rejected several other supposed procedural defects alleged by ACICS, and expressly did "not consider the Accrediting Council's challenges to the merits of the Secretary's decision." *Id.* at 102, 108-12, 115-21. Despite ACICS's request in its proposed order for the Court to vacate the decision, [Proposed] Order at 1, *ACICS*, ECF No. 55-1, the Court declined to do so, ordering only that the case be "**REMANDED** to the Secretary for further proceedings consistent with the Court's Memorandum Opinion." Order at 2, *ACICS*, ECF No. 75 [hereinafter "*ACICS* Order"]. Similarly, the Court's opinion explained that it would "remand this case for further proceedings consistent with this memorandum opinion" because it "[found] that the proper remedy for these violations is to remand this case to the Secretary for consideration of this

---

[3]    Plaintiffs' Amended Complaint also alleges, among other things, that ACICS, its representatives, and others associated with ACICS worked furiously behind the scenes to convince the Department to reverse its decision, AC ¶¶ 42-47; that the Department officials subsequently tasked with reviewing ACICS have deep and significant ties to for-profit schools accredited by ACICS, *id.* ¶¶ 55-61; and that Congress and the Department's Inspector General are currently investigating the Department's actions with regard to ACICS, *id.* ¶¶ 63-76. However, because Defendants' motion to dismiss does not address the merits of Plaintiffs' procedural claim (Count II), Plaintiffs will not discuss these facts any further.

evidence." *ACICS*, 303 F. Supp. 3d at 123. Because the Court remanded without vacating the December 2016 Order, that Order remained intact pending the Department's review.

However, on April 3, Secretary DeVos ordered that "ACICS's status as a federally recognized accrediting agency is restored effective as of December 12, 2016." Order at 1, *ACICS*, Docket No. 16-44-O (Apr. 3, 2018), https://web.archive.org/web/20190111153907/ https://www2.ed.gov/documents/press-releases/acics-docketno-16-44-0.pdf [hereinafter "April 2018 Order"]. Secretary DeVos reasoned that "[a]s a result of the district court's remand, there is no final decision on the recognition petition that ACICS submitted to the Department … in January 2016." *Id.* Thus, she concluded, "[p]ursuant to 34 C.F.R. § 602.37(h), ACICS will remain in that status until such time as I reach a final decision on its January 2016 petition." *Id.* Secretary DeVos's decision meant that colleges accredited by ACICS remained eligible to receive federal student aid past June 12, 2018.

### 3. *The collapse of Virginia College*

This case concerns several of those schools. Specifically, the Education Corporation of America ("ECA") operated 70 schools accredited by ACICS, including the Virginia College chain. AC ¶¶ 77-78. Prior to Secretary DeVos's decision, Virginia College's then-President repeatedly said that Secretary DeVos would reverse ACICS's derecognition. *Id.* ¶ 79. Similarly, around February 2018, the College held town halls to assure students that it would remain accredited. *Id.* However, the College was not able to earn accreditation from anyone besides ACICS, including from the Accrediting Council for Continuing Education & Training, which found that the College failed to meet nineteen of its standards. *Id.* ¶ 80. Nevertheless, because of Secretary DeVos's April 2018 Order, Virginia College and ECA's other schools remained accredited past June 12, 2018. *Id.* ¶ 81. The Department was therefore able to issue loans to Plaintiffs and other students to attend the College for the Fall 2018 term. *Id.* ¶ 82.

But Secretary DeVos's order was only a temporary lifeline, and Virginia College continued to struggle. On December 4, 2018, ACICS withdrew accreditation from the College. *Id.* ¶ 84. The next day, the College announced that it would shut its doors, along with ECA's other campuses. *Id.* ¶ 85. As late as one week before that announcement, the College (and, on information and belief, most of ECA's other schools) was accepting new students with new Department-issued loans. *Id.* Virginia College's Richmond campus ultimately closed on December 18, and ECA and its schools are now in receivership. *Id.* ¶ 86.

Plaintiffs Mark Passut and Mark Kaiser are former students of Virginia College's Richmond Campus. *Id.* ¶ 78. They were enrolled in the College's occupational therapy assistant program, *id.* ¶¶ 11-12, and were fulfilling fieldwork assignments during the Fall 2018 term, *id.* ¶ 83. They each took out several thousand dollars in Department-issued debt to pay their tuition and expenses for the term. *Id.* ¶¶ 11-12. But for the closure of Virginia College's Richmond campus on December 18, Plaintiffs would have been able to finish their fieldwork, and therefore receive credit for the Fall 2018 term. *Id.* ¶ 87. Plaintiffs eventually transferred to Eastern Virginia Career College, from which they have since graduated after spending more in tuition. *Id.* ¶ 88. Nevertheless, they still each owe over $24,000 to the Department for their education at Virginia College, including thousands of dollars for the Fall 2018 term. *Id.* ¶ 89. The Department's actions and Virginia College's closure also delayed their graduation from April 2019 to August 2019, thereby costing them several months of income. *Id.* ¶ 90.

C.    **Proceedings in this Court**

Plaintiffs filed their Complaint on June 3, 2019, ECF No. 1, and filed the operative Amended Complaint on August 22, 2019, ECF No. 14. Plaintiffs assert two claims against Secretary DeVos and the Department: (1) that Secretary DeVos's April 2018 Order was not permitted under the governing statutes and regulations, and was therefore arbitrary and

capricious, not in accordance with law, and in excess of her statutory and regulatory authority, in

violation of the Administrative Procedure Act, AC ¶¶ 99-106; and (2) that Secretary DeVos and

her advisors were biased in favor of ACICS, in violation of the Due Process Clause, the APA,

and general principles of administrative law, *id.* ¶¶ 107-12. Plaintiffs seek relief on behalf of

themselves and a putative Class of all persons to whom the Department of Education issued

loans to pay tuition or other expenses at schools owned or operated by ECA that were disbursed

between June 12 and November 21, 2018. *Id.* ¶¶ 92-98. Defendants moved to dismiss the

Amended Complaint on September 23, 2019. *See* Motion to Dismiss ("MTD"), ECF No. 16.

## LEGAL STANDARD

"In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), a court must

'treat the complaint's factual allegations as true ... and must grant [the] plaintiff the benefit of all

inferences that can be derived from the facts alleged.'" *Grell v. Trump*, 330 F. Supp. 3d 311, 315

(D.D.C. 2018) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)

(citation omitted)). "[D]etailed factual allegations" are not necessary, *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007), but "a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 570). Thus, the complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, although

Defendants' motion may be denied even if "recovery is very remote and unlikely," *id.* at 556.

Where the defendant presents a factual challenge to the Court's subject-matter jurisdiction under

Rule 12(b)(1), the Court "must go beyond the pleadings and resolve any disputed issues of fact

the resolution of which is necessary to a ruling upon the motion to dismiss," but nevertheless

"must give the plaintiff ample opportunity to secure and present evidence relevant to the

existence of jurisdiction," and give the plaintiff "the benefit of all reasonable inferences."

*Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018) (quotations omitted).

## ARGUMENT

### I.    <u>Defendants' threshold objections are meritless.</u>

To avoid defending the merits of Secretary DeVos's April 2018 Order, Defendants throw

a tangle of threshold objections at the wall, hoping something might stick. None of it does. ***First***,

Plaintiffs have standing because they were injured by the April 2018 Order, which enabled the

Department to issue loans to them to attend a failing school. ***Second***, Plaintiffs' injuries are

redressable because there are a number of mechanisms by which the Court may set aside those

loans. And ***third***, the April 2018 Order constitutes final agency action because it allowed

ACICS-accredited schools to continue receiving loans pending the Department's review on

remand. We address each point in turn.

### A.    Plaintiffs were injured by the April 2018 Order.

Defendants' principal argument for dismissal is that "Plaintiffs' alleged injury—their lack

of academic credit for a semester in which they incurred student loan debt ... *stemmed entirely*

*from their own poor attendance*, not the Secretary's decision to provisionally re-recognize their

school's accreditor." MTD at 1 (emphasis added). Thus, Defendants conclude, Plaintiffs lack

Article III standing. Defendants' extraordinary attempt to blame *Plaintiffs* for their inability to

earn credits when their school abruptly closed is irrelevant, unsubstantiated, and simply

incorrect.

#### 1.    *Plaintiffs adequately allege that they were injured by taking out loans that the Department could not lawfully issue.*

As an initial matter, Defendants' argument—including their premature challenge to

Plaintiffs' class allegations, MTD at 17 n.9—misconstrues Plaintiffs' claims. Plaintiffs allege

that Defendants' APA violations injured them and other members of the proposed class by enabling the Department to issue debt that, but for the Department's illegal conduct, could not have been issued under Title IV. *See* AC ¶ 105 ("Because the Department's decision to restore ACICS's accreditation was unlawful, schools accredited by ACICS remained ineligible to receive federal student aid, and any loans issued by the Department for the purposes of attending those schools during the interim recognition period were unlawful and void *ab initio*."); 20 U.S.C. §§ 1091(a)(1), 1099c (students must attend an eligible institution to be eligible for Title IV loans); 34 C.F.R. § 600.5(a)(6) (for-profit schools must be accredited to be eligible to participate in Title IV program). That injury, which applies to all members of the class, exists whether or not a particular student-borrower received credits and regardless of the particular reason a student-borrower may not have received credit—like an illness, a family issue, or, as Defendants incorrectly assert about Plaintiffs, difficulty completing coursework.

Even if the prospect of earning credits were essential to Plaintiffs' claims, Plaintiffs have adequately pleaded that they were on track to do so. Specifically, Plaintiffs allege that they were "completing fieldwork requirements for their degree that were not scheduled to be completed until late December 2018 or January 2019." AC ¶ 83. But Virginia College lost accreditation on December 4 and then closed on December 18. *Id.* ¶¶ 84, 86. Plaintiffs therefore, and through no fault of their own, could not have finished their fieldwork and received credit for the term by the time the school closed—like many other students affected by ECA's closure. *Id.* ¶ 87. Thus, whether Plaintiffs' injury is properly construed as the financial obligations imposed by their student loans, or in conjunction with their lost credits, Plaintiffs have adequately pleaded injury in fact.

## 2.    *Defendants inappropriately rely on materials outside the record to challenge Plaintiffs' standing.*

Defendants' rebuttal to these allegations is based *entirely* on materials outside the pleadings—materials to which they have sole access, and about which Plaintiffs have had no opportunity for discovery. Defendants submit that "[w]ith respect to an APA claim, a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment, or it may convert the motion into a motion for summary judgment under Rule 12(d)." MTD at 12 (quotation omitted). But that proposition is inapplicable here, since Defendants rely on neither the administrative record nor public documents, and is all the more galling in light of Defendants' opposition to producing the administrative record or briefing summary judgment on the same track as any motion to dismiss. *See* Defs' Opp'n to Scheduling Mot., ECF No. 9.

To be sure, "[i]n evaluating subject-matter jurisdiction, the Court may look beyond the complaint to 'undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" MTD at 11-12 (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)). But as *Herbert* makes plain, if "disputed jurisdictional facts … are inextricably intertwined with the merits of the case[,] [the court] should usually defer its jurisdictional decision until the merits are heard." 974 F.2d at 198. "This proviso to the usual rule ensures that, where jurisdictional defenses and the merits of a dispute overlap, the jurisdictional defense is not used—in the absence of special considerations—to short circuit the factual development and adjudicative process to which a plaintiff is generally entitled." *Hale v. United States*, 2015 WL 7760161, at *3 (D.D.C. 2015).

"Short circuit" is precisely what Defendants have attempted to do here. Under Defendants' mischaracterization of Plaintiffs' case—that Plaintiffs must show they were able to

earn the credits for which they borrowed money from the Department—their academic trajectory is relevant to the merits at least as much as to standing. As already noted, Defendants' arguments directly contradict the Amended Complaint, which alleges that the Plaintiffs *were* on track to finish their coursework and receive credit. Moreover, "[w]hen a defendant challenges the factual basis for the Court's subject matter jurisdiction via Rule 12(b)(1), plaintiff must be given an opportunity for discovery of facts necessary to establish jurisdiction." *Lopes v. Jetsetdc, LLC*, 4 F. Supp. 3d 238, 242 (D.D.C. 2014) (quotation omitted). If Defendants intend to dispute the Amended Complaint's factual averments, then Plaintiffs are entitled to discovery into their bases for doing so—particularly given that the Department has leveraged its sole access to the now-shuttered Virginia College's records to present this argument.

Even with this advantage, the Department has not presented any evidence on which the Court could rule in its favor. In the context of a Rule 12(b)(1) motion to dismiss, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 596 n.3 (D.C. Cir. 2009) (explaining that the standard set forth in Rule 56 is applicable in the context of a Rule 12(b)(1) motion to dismiss). The personal knowledge requirement of Rule 56 "is unequivocal, and cannot be circumvented." *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (striking portions of declarations that could not have been made on personal knowledge). Where declarations are "made on knowledge *and belief* and do not clearly demonstrate the affiants' personal knowledge of the facts, the [D.C.] [C]ircuit has found it inappropriate to rely on them." *Elzeneiny v. District of Columbia,* 125 F. Supp. 3d 18, 30 (D.D.C. 2015) (citing *Harris v. Gonzales*, 488 F.3d 442, 446 (D.C. Cir. 2007)). Moreover,

documentary evidence must be both admissible and authenticated. *See, e.g.*, *Akers v. Liberty Mut. Grp.*, 744 F. Supp. 2d 92, 97 (D.D.C. 2010).

In an attempt to authenticate Plaintiffs' school records and circumvent their hearsay nature, Defendants submit a declaration from Department employee Shari Mecca. Decl. of Shari Mecca ("Mecca Decl."), ECF No. 16-2. Ms. Mecca declares that the information provided in her declaration is true and correct to "the best of [her] knowledge *and belief*," and that the statements contained within the declaration are "based on [her] personal knowledge as an employee of the Department, and [her] review of the pertinent records." Mecca Decl. at 1 & ¶ 4 (emphasis added). Ms. Mecca declares that she "obtained authentic copies of documents concerning" Plaintiffs "through [her] access to ECA's databases," except that, "due to database system issues," an ECA employee, Ms. Ford, "provided [her] with authentic copies of the attendance records and activities of" Plaintiffs. *Id.* ¶ 7.

Ms. Mecca, however, does not have the personal knowledge required to authenticate these school records or to establish that they fall within an exception to the rule against hearsay. While she states that she was granted "access" to ECA's "internal databases" after ECA's closure, *id.* ¶ 6, she is not a custodian of these records and does not explain how she is qualified to certify how the documents were created and maintained—much less explain how they were in fact created and maintained. *See* Fed. R. Evid. 803(6), 902(11), (13), (14). The Federal Rules of Evidence do not allow documents to be authenticated simply by a person who later obtained them calling them "authentic." Mecca Decl. ¶ 7.

Moreover, Ms. Mecca fails to describe the "database system issues" that prevented her from personally accessing Plaintiffs' records—or why those "issues" would not raise concerns about the documents' accuracy and authenticity. *Id*. Rather than obtaining the documents in the

form they are kept, Ms. Mecca obtained them from a non-declarant, Ms. Ford, who provided her with what Ms. Mecca believes—without any stated basis—to be "authentic copies of the attendance records and activities." *Id.* But Defendants do not provide a declaration from Ms. Ford or any other ECA employee with the personal knowledge that Ms. Mecca lacks, such as where and how Ms. Ford obtained the records given ECA's closure nine months earlier, how those records have been maintained since ECA's closure, whether they were created at or near the time by, or from information transmitted by, someone with knowledge, and whether they were made and kept in the ordinary course of business. *See generally* Fed. R. Evid. 803(6), 902(11), (13), (14).

Ms. Mecca also lacks the personal knowledge required to support multiple conclusions and inferences that Defendants attempt to draw from her declaration. For example, Defendants rely heavily on "notes entered by school officials in the students' file," MTD at 15, but Ms. Mecca has no personal knowledge to interpret those notes or testify about the circumstances in which they were recorded. *See, e.g.*, Fed. R. Evid. 803(6)(A) (requiring that records be "made at or near the time by—or from information transmitted by—someone with knowledge"). Defendants also infer that the "WD" on Plaintiffs' transcripts is the result of Plaintiffs seeking to withdraw in early November 2018, MTD at 15, but Ms. Mecca has no personal knowledge regarding when or why Virginia College entered "WD" on transcripts, including whether the school automatically entered "WD" for all students whose coursework was still ongoing when the school closed. Indeed, ECA lists both Plaintiffs' withdrawal date as December 18, 2018—the date ECA closed. ECF No. 16-6 & 16-10. This would seem to *contradict*, not support, Defendants' theory that Plaintiffs both withdrew in November. *See* MTD at 15.

Finally, Ms. Mecca lacks the personal knowledge required to support the Department's inference that the records are complete, and thus its assertion that "the school records contain no indication that [plaintiffs] were permitted to complete their fieldwork hours after the Fall 2018 term ended and still receive credit," MTD at 16. As the evidence presented in Plaintiffs' declarations and exhibits demonstrates, the notes offered by Defendants in support of their motion are not only incomplete but misleadingly so, as the Plaintiffs transferred to other fieldwork assignments that were ongoing at the time of the closure. *See infra* pages 19-20. Because the information in Ms. Mecca's declaration and its accompanying exhibits "could not possibly have been based on the affiant's personal knowledge of the documents in question or the details of the [process] that produced them," the Court should not consider it—or the scornful argument they supposedly support. *Londrigan*, 670 F.2d at 1174-75.[4]

### 3. *The closure of Virginia College prevented Plaintiffs from completing their credits.*

Even if Defendants had properly presented these records, however, they would make no difference to Plaintiffs' standing. It is well-established that "'at this threshold stage,' the Court is 'obligated ... to accord [Plaintiffs] the benefit of all reasonable inferences,' and, '[a]bsent evidentiary offering[s]' that controvert specific jurisdictional allegations, the Court must delay 'weighing the plausibility' of those allegations until 'a later stage of the proceedings.'" *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 71 (D.D.C. 2019) (quoting *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018)). While Plaintiffs should not have to present any evidence

---

[4]    Plaintiffs do not waive any applicable rights or remedies under the Family Educational Rights and Privacy Act and its implementing regulations, which generally bar the disclosure of confidential student records except in narrow and specifically delineated circumstances. *See* 34 C.F.R. §§ 99.31(a)(3), 99.35; *cf.* MTD at 15 n.8.

beyond the allegations in their Complaint for the Court to deny Defendants' motion, in an abundance of caution, they offer the following.

By the Fall 2018 term, both Plaintiffs had completed all of their required coursework and only needed to complete two fieldwork placements to earn their degrees. Decl. of Mark Passut ("Passut Decl.") ¶ 1; Decl. of Mark Kaiser ("Kaiser Decl.") ¶ 1. Both withdrew from the fieldwork assignments that they had started that semester because they were not good fits for them, and enrolled at new sites in November with the assistance of Kathy Rainey, the Academic Field Coordinator for their program. Passut Decl. ¶ 3; Kaiser Decl. ¶ 3. They were required to spend eight weeks at the new sites. Passut Decl. ¶ 4; Kaiser Decl. ¶ 4.

Specifically, Ms. Rainey arranged for Mr. Kaiser to fulfill his fieldwork requirement at Circle Center Adult Day Services so that he could "finish out Fieldwork II this term." Kaiser Decl., Ex 1. Mr. Kaiser started his fieldwork there on November 26, 2018. Declaration of Sheila Selznick ("Selznick Decl.") Decl. ¶ 3. Circle Center anticipated that Mr. Kaiser would work there into January to fulfill his eight-week requirement, and "had no issue with Mr. Kaiser's fieldwork extending past the end of Virginia College's academic calendar." *Id.* ¶ 4. Ms. Rainey similarly helped Mr. Passut arrange a new placement at Lancashire Convalescent and Rehabilitation Center, informing him that he would "still be able to finish in time to start [his] second Fieldwork II." Passut Decl. ¶¶ 3-4, Ex. 1. He started working there on November 12, 2018 and was also scheduled to complete his fieldwork in January 2019. Passut Decl. ¶¶ 2, 4. Like Plaintiffs, other students in the occupational therapy assistant program needed to work at their fieldwork site into January to fulfill their requirements. Kaiser Decl. ¶ 4, Ex. 2.

On December 5, 2018, Mr. Kaiser and his supervisor at Circle Center, Sheila Selznick, were informed by Ms. Rainey that the school was closing. Kaiser Decl. ¶ 5; Selznick Decl. ¶ 5.

Mr. Passut found out about the school's closing that same day. Passut Decl. ¶ 6. The next day, Ms. Rainey emailed Mr. Kaiser, Mr. Passut, and several of their classmates: "Unfortunately, because you will not be finished your Fieldwork II by December 18 when we close, you will not be able to finish your fieldwork. I am so sorry." Kaiser Decl. ¶ 6, Ex. 3. Ms. Rainey also emailed Mr. Passut, stating that his grade would be an "incomplete" and that "I wish I knew why there were no safeguards in place and why our program could not continue until you guys finished your fieldwork." Passut Decl. ¶ 9, Ex. 4.

In other words, Plaintiffs' inability to obtain credit for Fall 2018 stemmed entirely from the abrupt closure of their school—which limped along as long as it did only because Defendants unlawfully restored its accreditor. Plaintiffs' loss of credit had *nothing* to do with any academic failing on their part. In that respect, Plaintiffs are like the many other students that could not complete their credits because of their schools' closures. Lest there be any doubt, Mr. Kaiser subsequently earned fieldwork credit from Circle Center after transferring to a new school, Selznick Decl. ¶ 8, and Lancashire hired Mr. Passut as an occupational therapy assistant after his fieldwork ended, Passut Decl. ¶ 11. Defendants also ignore that Mr. Passut and Mr. Kaiser had a 3.72 GPA and a 3.88 GPA, respectively, on the transcripts that Defendants have attempted to place into evidence—hardly the failing students Defendants attempt to portray. Ex. E, Ex. I, ECF Nos. 16-6, 16-10.

That should be enough to deny Defendants' motion as to standing. But Defendants' attacks on Plaintiffs cannot go unrebutted.

***First***, Defendants attack Plaintiffs' attendance history. MTD at 14. But the same attendance reports that Defendants used to show Plaintiffs' missed hours of fieldwork in October and November—when they were either delayed in starting their fieldwork assignments or

switching between fieldwork assignments—reveal perfect or near perfect attendance at their new placements until the school closed. *See* Ex. G, ECF No. 16-8 (showing that Mr. Kaiser had perfect attendance from November 26 when he began at Circle Center, until December 7, when Ms. Rainey confirmed he could not earn credit); Ex. C, ECF No. 16-4 (showing that Mr. Passut had nearly perfect attendance from November 12 when he began at Lancashire, except one sick day, until December 7).

*Second*, Defendants assert that Plaintiffs attempted to withdraw from fieldwork altogether. MTD at 15. Conspicuously absent is any assertion that they *actually* withdrew from their fieldwork at that point or any other. In fact, as Plaintiffs have shown, they simply transferred to different fieldwork assignments—which would have enabled them to receive credit for the term. Defendants also reference the Plaintiffs' supposed transcripts, but for the reasons already explained, those transcripts are both unreliable and controverted by the evidence of Plaintiffs' transfers.

*Third*, Defendants claim that, even if Plaintiffs could have finished their fieldwork and received credit for the semester, "it is entirely speculative whether they would have done so, in light of these students' failure to complete the hours when due." MTD at 16. That accusation is wholly baseless. No institution should have more appreciation than the Department of Education that students regularly overcome obstacles while pursuing their education, but here, it cynically insists that Mr. Passut and Mr. Kaiser were incapable of doing so. As explained above, Plaintiffs were exemplary students at Virginia College and fully on track to complete their hours and receive credit for the semester.

To be clear: Defendants' attacks on Plaintiffs' conduct and academic performance are irrelevant and false. Defendants have cherry-picked and misrepresented snippets from Plaintiffs'

confidential student records in a rush to end this case before their own actions are subjected to the same type of scrutiny they applied—hastily and inaccurately—to Plaintiffs. Ultimately, the Court should reject Defendants' inappropriate attempt to make summary judgment arguments using incomplete, unauthenticated evidence, to which they have unilateral access, and deny Defendants' motion to dismiss as to standing.

**B.** **The Court can and should provide a remedy for Plaintiffs' injuries.**

Next, Defendants assert that Plaintiffs cannot establish redressability because there is no remedy by which the Court can give them relief. MTD at 17-20. At the outset, Defendants mistakenly conflate the proper question with respect to *standing*—*i.e.*, whether some form of relief exists that would remedy the plaintiff's injury—with the *merits* question—*i.e.*, whether the plaintiff is ultimately entitled to the remedy sought. To establish redressability, a plaintiff need only show that "the relief sought, *assuming that the court chooses to grant it*, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (emphasis added); *Cutler v. HHS*, 797 F.3d 1173, 1180 (D.C. Cir. 2015) ("[W]e must assume at this stage that the requested relief would be granted.").

In fact, there are at least three meaningful remedies which the Court can, and should, give to Plaintiffs if they prevail: vacatur of Plaintiffs' loans; an injunction barring the Department and its agents from collecting upon their loans; and a declaration that their loans were unlawfully issued. Any of these remedies suffices to establish standing.

***First***, the Court may vacate Plaintiffs' loans. *See* AC at 40 (asking the Court to "vacate the interim recognition decision and any resulting loans issued by the Department"). Under the Administrative Procedure Act, a reviewing court may "hold unlawful and set aside agency action … found to be … not in accordance with law." 5 U.S.C. § 706(2). Assuming that Plaintiffs prevail on the merits, as the Court must in assessing standing, *see, e.g.*, *LaRoque v. Holder*, 650

F.3d 777, 785 (D.C. Cir. 2011), Defendants unlawfully recognized ACICS as an accreditor. Defendants then issued loans for Plaintiffs to pay to attend an ACICS-accredited school without any lawful authority to do so. *See Prof'l Massage Training Ctr., Inc.*, 781 F.3d 161 at 170 ("Accreditation … is a prerequisite to Title IV funding."). The loans were therefore void *ab initio*, and must be set aside. Thus, vacatur constitutes a "mechanism" by which Plaintiffs' loans may effectively be discharged. *Cf.* MTD at 18.

**Second**, the Court may exercise its inherent equitable authority to set those loans aside and enjoin the Department from attempting to collect upon them. "[T]he scope of a district court's equitable powers ... is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (quotation omitted). The APA does not displace the district court's equitable authority; in a case properly brought under the APA, "injunctive relief, preliminary or permanent, is available in the district court," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982), and courts can and frequently do award such relief. Here, the Court may exercise its equitable authority to redress the harms caused by Defendants' unlawful actions by, among other things, preventing Defendants from further collecting on Plaintiffs' loans or by ordering Defendants to discharge Plaintiffs' loans. Indeed, there are many statutory mechanisms through which the Department discharges debt. *See, e.g.*, 20 U.S.C. §§ 1087(c)(1), 1087e(h). While these statutory mechanisms have been narrowed by the Department's implementing regulations, the Department's statutory authority remains intact. The Court may therefore order the Department to exercise these authorities to give relief to Plaintiffs.

Whether framed in terms of vacatur or the court's inherent equitable authority, courts have explained that vacating an agency's unlawful action may require unwinding specific transactions or consequences based on that action. In *National Wildlife Federation v. Espy*, for

example, the Ninth Circuit considered whether the courts could, at the request of an environmental organization, unwind a transfer of property from the government to a mortgagee where that transfer violated the relevant environmental protection statutes. 45 F.3d 1337, 1340 (9th Cir. 1995). The court explained that Section 706 "authorize[s] the district court … to void a property transaction and order a transfer of title," subject to "principles of equity." *Id.* at 1342-43. In contrast, Plaintiffs here ask only that the Court void an unlawful transaction—the loan agreements—between Plaintiffs and Defendants, which will not result in *any* harm to third parties or compel anybody to take affirmative action like transferring title. That sort of relief falls well within the Court's authority under the APA and principles of equity. *See, e.g.*, *Reed v. Salazar*, 744 F. Supp. 2d 98, 120 (D.D.C. 2010) (vacating an annual funding agreement as arbitrary and capricious).

In other cases, courts have barred agencies from collecting payments pursuant to unlawful agency orders. For example, the Court in *Texas Children's Hospital v. Burwell* enjoined the agency from enforcing a new Medicaid auditing requirement, and further required it to inform state agencies that it would not seek to recoup any federal funds based on a state's non-compliance with that requirement. 76 F. Supp. 3d 224, 246-47 (D.D.C. 2014). And in *Coalition for Common Sense in Government Procurement v. United States*, the Court explained that vacating a rule "would require the Department to reimburse the refunds pharmaceutical companies have now paid to the Department under various agreements," although it declined to vacate on the circumstances present there. 671 F. Supp. 2d 48, 60 (D.D.C. 2009). Here, Plaintiffs similarly ask the Court to bar Defendants from collecting payments on unlawfully issued loans. Thus, the sort of relief sought by Plaintiffs is well within the Court's equitable authority.

To elide these avenues of redress, Defendants misinterpret *Palisades General Hospital v. Leavitt*. *See* MTD at 19. In *Palisades*, the district court concluded that the agency had arbitrarily declined to correct a hospital's wage data, thereby preventing it from obtaining reclassification to a different geographic region with a higher Medicaid reimbursement rate, but ultimately declined to order the agency to reclassify the hospital. 426 F.3d 400, 402 (D.C. Cir. 2005). The D.C. Circuit affirmed the district court's order, explaining that both the APA and the Medicare statute barred the district court from dictating a particular outcome in the hospital's reclassification proceedings. *Id.* at 403-04. Indeed, the court noted that the agency had adopted a policy of refusing to revisit classification decisions based on revised wage data. *Id.* at 404. Thus, the Court could not order the agency to exercise its discretion to reclassify the hospital, or to give it the adjusted reimbursement that would follow from such a decision.

*Palisades* is wholly unlike the circumstances present here. *Palisades* stands for the narrow proposition that a district court may not impose "injunctive relief relating to the relevant agency's analysis or discretion *on remand*." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 280 F. Supp. 3d 187, 190 (D.D.C. 2017) (emphasis added). That proposition is well-established; for example, if a court vacates an ordinary rule, the court cannot then order the agency to adopt a specific alternative. The equivalent here would be to enjoin the Department from recognizing ACICS as an accreditor—which is not what Plaintiffs seek. Indeed, Plaintiffs do not ask the Court to require the Department to exercise its discretion in any particular way. Plaintiffs ask only that the Court vacate or enjoin agency actions that were predicated on an underlying unlawful order. This case is therefore akin to the cases cited above, not to *Palisades*.

**Third**, at a minimum, a declaration that the April 2018 Order was unlawful, and that Plaintiffs' loans were unlawfully issued, would provide some relief to Plaintiffs. Such a

declaration could prevent the Department from certifying that a loan in default is "legally enforceable" in an effort to garnish Plaintiffs' tax returns or applicable federal benefits. 31 U.S.C. § 3720A(b); 31 C.F.R. §§ 285.2, 285.4, 285.5. Alternatively, such a declaration could serve as a basis for asking the Secretary to terminate collections on the loan, 34 C.F.R. § 30.1, or for disputing the enforceability of the loan or obtaining additional review by the Department prior to enforcement, *id.* § 30.33. Again, Plaintiffs do not ask the Court to compel any discretionary action by the Department. But the D.C. Circuit has held that the possibility that the agency could issue discretionary relief based on a favorable court decision is sufficient for redressability purposes, even where the agency cannot be "*required* to take this precise series of steps." *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013).

Finally, Defendants argue—in a footnote toward the end of their brief—that a borrower simply cannot "void her student loan based on her school's loss of accreditation." MTD at 29 n.12. The argument's location is indicative of its merits. Defendants rely on the D.C. Circuit's decision in *Armstrong v. Accrediting Council for Continuing Education & Training*, which held that federal policy preempted a borrower's state-law contract claims against her school. 168 F.3d 1362, 1369 (D.C. Cir. 1999). But *Armstrong* is about the preemption of state law claims, not about whether the Administrative Procedure Act provides relief where a borrower's loans are predicated on an unlawful agency order. Here, the Department would not have been able to issue these loans but for its own unlawful conduct. Moreover, the Court in *Armstrong* made plain that its decision was based on the state of federal law in the late 1980s, at "a time when federal policy protected lenders from defenses" based on "school misconduct." *Id.* at 1364. Now, of course, federal regulations include protections for borrowers injured by failing or fraudulent schools. *Id.*;

*see also* 34 C.F.R. § 685.206. Thus, the Court can, and should, give Plaintiffs relief that would likely—indeed, more than likely—redress their injuries.

### C.    The April 2018 Order was final agency action.

Finally, Defendants assert that the April 2018 Order did not constitute final agency action. MTD at 21-23. But the April 2018 Order definitively restored "ACICS's status as a federally recognized accrediting agency" while the Department considered its underlying petition for recognition. April 2018 Order at 1. If the Department had not issued the April 2018 Order, ACICS's accreditations would have been legally invalid as of June 12, 2018, and the Department could not have lawfully issued loans for attendance at schools accredited only by ACICS. Because the Department issued the April 2018 Order, it could in fact issue those loans. This is quintessential final agency action.

The D.C. Circuit has emphasized, time and again, that an order affording interim relief pending an ultimate determination by the agency constitutes final agency action. Most recently, in *Clean Air Council v. Pruitt*, the Court held that the EPA's decision to stay new methane emissions standards pending reconsideration of those standards was final and reviewable. 862 F.3d 1, 6 (D.C. Cir. 2017). The Court reiterated that an agency's decision to "grant[] an application for interim relief from a … standard while it reconsider[s] that standard … 'represents the final agency position on this issue, has the status of law, and has an immediate and direct effect on the parties.'" *Id.* (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 823 F.2d 608, 614-15 (D.C. Cir. 1987)). And the Court specifically rejected the argument that where an agency "grants reconsideration *and imposes a stay*, we have

27

no power to hear the case." *Id.* at 7. So too here: Defendants' decision to *maintain ACICS's recognition* pending an ultimate determination on remand is all that is needed.[5]

Defendants do not contend that *that* decision—the decision to grant recognition to ACICS while the underlying petition was under review—was tentative. Indeed, "[t]here is no indication that the [Department] intend[ed] to reconsider th[at] decision or to vacate the grant of interim relief." *Id.* (quoting *Int'l Union*, 823 F.2d at 614-15). Nor do they deny that it has the status of law and had immediate legal consequences for ACICS, the schools it accredited, and the Department; to the contrary, they concede that "ACICS was allowed to continue operating" only as "*a consequence*" of the April 2018 Order. MTD at 22. Thus, under a correct application of the "pragmatic and flexible" *Bennett* inquiry, *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016) (quotation omitted), the April 2018 Order is plainly final.

Defendants attempt to evade this clear governing precedent through two plainly incorrect propositions. **First**, they argue that the April 2018 Order is non-final because the "Secretary's determination is facially non-final" and "makes clear that the Secretary decided to maintain the status quo 'until such time as [she] reach[ed] a final decision' on ACICS's petition." MTD at 22

---

[5]    Courts have frequently rejected arguments that interim relief pending an ultimate agency decision is non-final. *See, e.g.*, *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 n.5 (2d Cir. 2018) ("[I]t is well settled that 'an order delaying the rule's effective date ... [is] tantamount to amending or revoking a rule.'") (quoting *Clean Air Council*, 862 F.3d at 6; *Nat'l Women's Law Ctr. v. OMB*, 358 F. Supp. 3d 66, 85 (D.D.C. 2019) ("OMB's stay is not interlocutory simply because OMB will conduct future administrative proceedings to decide whether to approve EEOC's Component 2 data collection."), *appeal docketed*, No. 19-5130; *Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 176 (D.D.C. 2018) (describing *Clean Air Council* as holding that the "agency's decision to stay implementation of a rule and thus 'relieve[] regulated parties of any obligation to meet the ... deadline' was a reviewable 'final agency action'") (quoting *Clean Air Council*, 862 F.3d at 6-7); *Pineros y Campesinos Unidos del Noroeste v. Pruitt*, 293 F. Supp. 3d 1062, 1066 (N.D. Cal. 2018) ("By repeatedly delaying the effective date of the Pesticide Rule, EPA engaged in substantive rulemaking and was thus required to comply with the requirements of the APA.").

(quoting April 2018 Order at 1). Leaving aside that the Department's December 2016 order remained a "final decision," *see infra* Part II, Defendants' argument misses the point: the April 2018 Order was final as to whether ACICS remained recognized *during the interim period*, with all the consequences for schools and students that flowed from that status.

Moreover, the cases Defendants cite for the proposition that "an agency's characterization of the finality of its action" is entitled to "great weight," MTD at 22, are inapposite. In *Food & Water Watch v. EPA*, the agency's document was non-final because, by its terms, it "[did] not impose any binding or legal obligations on any actor." 5 F. Supp. 3d 62, 82 (D.D.C. 2013). The plaintiff's claim thus failed on the *second* prong of the *Bennett* inquiry, which is not disputed here; the first prong was not at issue. And in *Southwest Airlines v. Department of Transportation*, the Court held that a guidance letter that merely stated the agency's position was not final where the letter had no substantive effects and the agency then launched an investigation in which the agency "explicitly stated that the … letter was not its final word." 832 F.3d 270, 274 (D.C. Cir. 2016). Far from placing "great weight" on an agency's characterization, both cases merely cite it as one of many factors that a court may consider in applying *Bennett*. Neither case has any bearing on whether an order with binding significance is reviewable if it happens to occur during the pendency of a larger proceeding.

***Second***, Defendants suggest that the April 2018 Order is akin to an unreviewable "threshold determination that further inquiry is warranted." *FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980). But, again, the D.C. Circuit squarely rejected this argument in *Clean Air Council*. There was no dispute in *Clean Air Council* that the EPA's "decision to grant reconsideration, which merely begins a process that could culminate in no change to the rule," was non-final. 862 F.3d at 6. Nevertheless, the *accompanying stay* was final, as explained above.

29

*Id.* While Defendants' decision to reconsider ACICS's recognition might not be final and reviewable, its decision to recognize ACICS *pending that proceeding* certainly is. Ultimately, "the applicable test is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently 'final' to warrant review in the context of the particular case." *Friedman*, 841 F.3d at 542 (quotation omitted); *see also Salazar v. King*, 822 F.3d 61, 83-84 (2d Cir. 2016) ("The APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review."). Where legal rights are definitively changed pending reconsideration, review need not await "the completion of a full enforcement action." *CSI Aviation Servs., Inc. v. Dep't of Transp.*, 637 F.3d 408, 413 (D.C. Cir. 2011). Thus, the April 2018 Order constitutes final agency action.

## II.    The April 2018 Order exceeded Defendants' authority under the governing statutes and regulations.

Defendants' attempts to defend Secretary DeVos's April 2018 Order on the merits fare no better than their attempts to evade merits review in the first place. *See* MTD 23-30. Secretary DeVos's order was based on an error of law: namely, the unfounded treatment of the Court's order in *ACICS* as having vacated the Department's December 2016 Order denying recognition to ACICS even though it did not say so, and the following presumption that she could recognize ACICS on an interim basis while its recognition proceedings were pending. Defendants do not dispute that, assuming the Court's order did not vacate the Department's decision, Secretary DeVos lacked the authority to provisionally recognize ACICS. Thus, the dispositive question is whether the Court's decision vacated the Department's December 2016 Order or whether it left that order intact pending the Department's reconsideration.

In *Heartland Regional Medical Center v. Sebelius*, the D.C. Circuit explained how to determine whether an ambiguous court decision had the effect of vacating an agency's order or

instead remanding it without vacatur. *Heartland* dealt with a rule (the "rural location requirement") promulgated by the Department of Health and Human Services in 1992 that made it easier for a rural hospital to qualify as a "sole community hospital" in a given area. 566 F.3d 193, 193 (D.C Cir. 2009). In 1998, the district court concluded that the Department had failed to "adequately consider[] other approaches" in promulgating the rule, and held that the rule was "invalid." *Id.* at 195. In 1999, the Department on remand "considered the alternatives but decided to retain the rural location requirement." *Id.* The plaintiff nonetheless asserted that the district court's 1998 decision had vacated the rural location requirement, and so it should have been treated as a sole community hospital from 1992 through 1999. *Id.*

*Heartland* established a framework for determining the effect of a judicial order on an agency's action. The Court explained that courts "must look not only to the district court's having declared the … rule 'invalid,' but also to the nature of the flaw in the agency decision there under review, to circuit law governing the proper remedy for such a flaw, and to the remanding court's analysis of that flaw, viewed in the context of 'the decision as a whole.'" *Id.* at 197 (quoting *Select Specialty Hosp. of Atlanta v. Thompson*, 292 F. Supp. 2d 57, 69 (D.D.C. 2003)). A critical element in that analysis is whether "the agency had 'little or no prospect' of curing the defect in the rule," such that vacatur would have been appropriate. *Id.* (quoting *Illinois Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997)). Importantly, "the terms 'invalid' and 'vacated' are not synonyms," and courts "may label an agency's action 'invalid' even when [they] have remanded it for further proceedings without having vacated it." *Id.* at 198.

Applying that test, the Court held that the district court's decision had remanded without vacating the rural location requirement. To aid in determining what the district court did, the Court applied the familiar *Allied-Signal* factors for assessing when vacatur is merited: "(1) the

seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Id.* at 197 (quotation marks and alterations omitted). The first factor supported remand without vacatur: the agency's mistake lay solely in failing to "respond to reasonable alternative[s]," and "[w]hen an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied-Signal* counsels remand without vacatur." *Id.* at 198. The second factor did as well: "vacatur of the rural location requirement would have raised substantial doubt about HHS's ability to recoup payments." *Id.* Thus, "because all indications … point[ed] toward remand without vacatur," the Court concluded that "the district court left the 'invalid' rural location rule in place pending a curative rulemaking." *Id.* at 199.

Defendants misconstrue the *Heartland* framework in several respects. ***First***, Defendants claim that "[a]bsent a clearer expression of the court's intent *not* to vacate," its decision should be interpreted to have vacated the agency's order. MTD at 23. But *Heartland* did not allocate the burden to one side or the other. Moreover, the D.C. Circuit has suggested that a court's opinion must "clearly evidence[] its intent" *to* vacate if its order does not mention vacatur. *Nebraska Dep't of Health & Human Servs. v. HHS*, 435 F.3d 326, 329 (D.C. Cir. 2006) (citation omitted). ***Second***, Defendants also interpret *Heartland* to suggest that "*all indications*" must "point to remand without vacatur." MTD at 25. But *Heartland* did not *require* that all indications point toward remand without vacatur; it simply noted that all indications did so *in that case*.

Regardless, all indications similarly point to remand without vacatur here. The Court's decretal language in *ACICS* was clear: the Court "**ORDERED** that th[e] case [be] **REMANDED** to the Secretary for further proceedings consistent with the Court's Memorandum Opinion," without mentioning vacatur. *ACICS* Order at 2. That language is substantially the same as the

language the D.C. Circuit in *Heartland* found to indicate remand without vacatur. *See Heartland*, 566 F.3d at 198 ("for action consistent with the foregoing opinion"). Similarly, in its opinion, the Court concluded that "the proper remedy for these violations is to remand this case to the Secretary." *ACICS*, 303 F. Supp. 3d at 123. The fact that the Court's order referred only to "remand," and omitted any mention of "vacatur," is even more striking considering that ACICS specifically asked for vacatur numerous times. *See, e.g.*, Pl.'s Mot. for Summ. J. at 1, *ACICS*, ECF No. 55 ("Defendants' unlawful decision should be set aside."); Pl.'s Mem. at 1, *ACICS*, ECF No. 66 (asking the Court to "vacate the Secretary's decision"); [Proposed] Order at 1, *ACICS,* ECF No. 55-1 (proposing that "the Decision of the Secretary … is hereby VACATED"). Nor, for that matter, did the Department seek clarification or review of the Court's order.

The most reasonable interpretation of the Court's order is that the Court meant what it said, not what it didn't say. By its terms, the Court's order remanded the Department's December 2016 Order, but left that order intact pending the Department's review on remand.[6] The *Allied-Signal* factors—the minor deficiencies in the Department's order, and the likely harm to students by allowing ACICS to continue operating—confirm this reading of the Court's order.

**First**, the deficiencies that the Court identified are ones that the Department could easily redress on remand, and that typically merit remand without vacatur. The D.C. Circuit has "commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966 (D.C. Cir. 1990). "A procedural flaw in the adoption of a rule

---

[6]    Indeed, in other cases where a judicial decision remanded without expressly vacating an agency's order, that agency has treated the order as valid, although the agency may cut back on any enforcement action. *See* William S. Jordan, III, *Ossification Revisited: Does Arbitrary and Capricious Review Significantly Interfere with Agency Ability to Achieve Regulatory Goals Through Informal Rulemaking?*, 94 Nw. U. L. Rev. 393, 427 (2000).

does not automatically make the opposite of that rule the proper outcome," and so "[o]ften courts will remand to the agency for reconsideration without technically vacating the regulation when the challenged rule fails for lack of reasoned decision-making." *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 13 (D.D.C. 2004), *aff'd sub nom. Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24 (D.C. Cir. 2005); *see also Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 15 (D.D.C. 2019) ("[C]ourts most commonly remand without vacatur agency decisions that suffer from procedural, rather than substantive, deficiencies."). Here, the Department could well have concluded that the additional evidence that ACICS submitted would not have affected the ultimate outcome, especially given the overwhelming evidence of ACICS's absentee oversight of failed for-profit colleges that the Department had relied upon in terminating ACICS's recognition in the first instance.

Courts have repeatedly found that an agency's failure to consider potentially relevant evidence is the sort of deficiency that merits remand without vacatur. In *U.S. Sugar Corp. v. EPA*, for example, the D.C. Circuit concluded that the EPA had failed "to address substantial record evidence," but remanded without vacating because it was "likely that the EPA will be able to adequately explain its [decision] on remand after properly considering the matter." 830 F.3d 579, 630 (D.C. Cir. 2016). Similarly, the D.C. Circuit in *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration* held that the failure to consider even "volumes of evidence" did not warrant vacatur. 429 F.3d 1136, 1147 (D.C. Cir. 2005). Many other cases have reached similar conclusions. *See, e.g.*, *Int'l Union*, 920 F.2d at 966-67 (evidence of "false positives"); *Massachusetts v. Nuclear Regulatory Comm'n*, 924 F.2d 311, 335 (D.C. Cir. 1991) ("expert affidavit"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 98-99 (D.D.C. 2017) ("expert critiques"); *Friends of the Capital Crescent Trail v. Fed.*

*Transit Admin.*, 218 F. Supp. 3d 53, 60 (D.D.C. 2016) ("new information about WMATA's safety and ridership numbers").

Defendants claim that the "type of deficiency" the Court identified "is similar to the 'process' deficiency that the *Heartland* court found indicated vacatur." MTD at 29. That is wrong in several respects. Most obviously, the D.C. Circuit in *Heartland* concluded the agency's failure to "respond to reasonable alternative[s]" did *not* warrant vacatur because it was a flaw that could "readily [be] cure[d]." 566 F.3d at 198. Moreover, as explained above, procedural decisionmaking flaws in general, and the failure to consider evidence in particular, do not usually warrant vacatur. Far from supporting Defendants' assertion that the Court vacated the Department's order, the comparison to *Heartland* affirmatively undermines it.

The Court also signaled that the Department's error could readily be cured. The Court emphasized that it was ruling only "that the Secretary procedurally erred by failing to consider various categories of relevant evidence," and either rejected or "f[ound] it unnecessary" to reach ACICS's challenges to the merits of Secretary King's order. *ACICS*, 303 F. Supp. 3d at 121. As the Court explained, "[w]hile the [Secretary]'s decision [ultimately] *may be valid*, this Court cannot affirm it." *Id.* at 114 (emphasis added). Defendants cherry-pick several statements from the Court's order that, in their view, suggested that the Department could reach a different result on remand. MTD at 28-29. The question for *Allied-Signal* purposes, however, is not whether the Department *could* reach a different decision, but the likelihood that it would be able to justify its *original* decision after correcting the errors identified by the Court. Indeed, if there were no prospect that the Department would reach a different decision, then any error would be harmless, and remand would be unnecessary. The Court did not suggest that the Department *could not* provide an adequate justification for terminating ACICS's recognition on remand.

And with good reason. As the Court explained, the Department's decision, which was the culmination of a year-long recognition process, found that ACICS was noncompliant with at least five separate recognition criteria. *ACICS*, 303 F. Supp. 3d at 93.[7] In its briefing, the Department stressed that the evidence that ACICS wanted it to consider was of little value, especially considering that ACICS *admitted* that it was out of compliance with numerous recognition criteria, and that the Department had already considered thousands of pages of evidentiary material submitted by ACICS. *See* Reply ISO Defs.' Cross-MSJ at 15-17, *ACICS*, ECF No. 69. For Defendants to now claim that the order's deficiencies were so significant as to warrant vacatur is revisionist history, and in significant tension with their prior representations.

***Second***, vacating the Department's December 2016 derecognition decision was likely to disrupt the lives of students for no good reason. That is not mere hindsight: it was clear at the time of the Court's ruling that ACICS accredited failing schools. Specifically, ACICS accredited schools that produced "astronomical debt levels and terrible outcomes for students," AC ¶ 26, including schools like Corinthian Colleges, Westwood College, ITT Technical Institute, and Fast Train College, which had all collapsed (and in some cases come under federal and state investigation) prior to the Court's decision, *id.* ¶ 28. It is precisely those concerns that led the Department to terminate ACICS's recognition in the first place. Moreover, we now know that reinstating ACICS's recognition allowed it to accredit schools like Virginia College, harming thousands of students. Thus, vacating the December 2016 derecognition decision could have—

---

[7]    The Court's oral rulings on ACICS's motions for expedited relief underscored the reasonableness of the December 2016 Order. *See, e.g.*, Transcript at 50, *ACICS*, ECF No. 13 ("It's hard for me to say that the Department acted arbitrarily and capriciously and beyond what the law permits when in fact there has not been compliance…. And here there's evidence of the fact that there was noncompliance two years ago"); Transcript at 120, *ACICS*, ECF No. 60 ("[O]ne of the realities is that there clearly was significant noncompliance that was acknowledged candidly by [ACICS's then-President].").

and the provisional reinstatement indeed *did*—exposed thousands of students to being ripped off by schools that did not merit the imprimatur of accreditation. *See Prof'l Massage Training Ctr.*, 781 F.3d at 170 ("Accreditation … provides assurance that the federal loans and grants are awarded to students who will get the education for which they are paying.").

Defendants claim that, had the Court remanded without vacatur, some ECA schools may not have found another accreditor, thereby leaving students with no school to attend. MTD at 29. Again, that is because those schools *did not warrant accreditation*, as subsequent developments confirmed. Leaving the Department's order intact during remand would have prevented students at those schools from being exposed to financial and other injuries. It would also have been far more disruptive and confusing to students and schools to flip ACICS's recognition back on for several months before switching it off again. In any event, those schools still had until June 12, 2018—another two months—to find another accreditor, after they had already had nearly *fourteen* months to do so.[8] The Department's regulations, which bar a stay of an order denying recognition during any "appeal in the Federal courts," make plain that accrediting agencies are entitled to no more than that. 34 C.F.R. § 602.38. Ultimately, the recognition process is meant to protect the interests of students—not the business interests of accreditors and for-profit schools.

Defendants place substantial reliance on *Select Specialty Hospital v. Thompson*, a case prior to *Heartland* in which the Court interpreted an ambiguous D.C. Circuit decision to have vacated the rule at issue. 292 F. Supp. 2d 57 (D.D.C. 2003). But that case is readily

---

[8] Defendants' opposition to ACICS's motion for expedited relief in *ACICS* made these points quite eloquently. As Defendants explained, the Department had "instituted an orderly process to resolve issues arising from the denial by the Secretary of the renewed recognition of ACICS," including by "deem[ing] institutions to hold recognized accreditation" until June 12, 2018. Defs.' Opp. to Pl.'s Mot. for TRO & Prelim. Inj. at 23, *ACICS*, ECF No. 11. Thus, "[n]one of the requirements applicable to institutions that had been accredited by ACICS will cause those institutions or the students they serve 'substantial injury.'" *Id.* (quotation and alteration omitted).

distinguishable. In *Select Specialty Hospital*, the agency's action "was invalidated because of an erroneous view of the law"—an error that the agency could not readily cure on remand. *Id.* at 69. The Court contrasted those circumstances to the type present here, where an agency simply "failed to provide an adequate explanation" for its actions. *Id.* This case is therefore more comparable to *Heartland*, where the error at issue warranted remand without vacatur.

Defendants nevertheless seize on two aspects of this Court's decision in *ACICS* which, they say, are comparable to *Select Specialty Hospital*. **First**, Defendants note that the Court in *ACICS* did not specifically address the *Allied-Signal* or other equitable factors. MTD at 27. But the D.C. Circuit in *Heartland* expressly rejected the plaintiff's argument that "because the district court did not apply the *Allied–Signal* factors in *Heartland I*, it must have intended to vacate the rural location rule," given that "[t]he *Allied–Signal* factors were well understood." 566 F.3d at 197. **Second**, Defendants suggest that the Court ordered the Department to engage in *de novo* review. MTD at 27. But the Court in *ACICS* did not require the Department as a whole to start from scratch; it merely noted that the Secretary would be required to consider any determination *by Department staff* de novo, and that there was therefore no reason to remand to the Department staff directly. *ACICS*, 303 F. Supp. 3d at 122. Defendants cannot recast this identification of the proper decisionmaker to receive the remand as evidence that the Court meant to vacate. Indeed, the fact that the Court explicitly chose *not* to send the matter back to Department staff to review all the evidence anew supports Plaintiffs' interpretation of the order, not Defendants. Thus, *Select Specialty Hospital* has no bearing here.

Finally, Defendants rely on the fact that the Court cited several decisions that vacated agency action. MTD at 27. But the Court cited those decisions not for their *vacatur* analysis but for the proposition that "the proper remedy is to remand the case to the Secretary so that she may

consider the evidence in the first instance," rather than for the Court to prematurely weigh in regarding the merits of the Secretary's decision. *ACICS*, 303 F. Supp. 3d at 121-22. Moreover, two of the cases cited by the Court make no mention of vacatur whatsoever. *See Ehrman v. United States*, 429 F. Supp. 2d 61, 71 (D.D.C. 2006) ("This matter is hereby remanded"); *Smith v. Dalton*, 927 F. Supp. 1, 10 (D.D.C. 1996) ("**ORDERED** that this case be remanded"). And while the Court cited to 34 C.F.R. § 602.37(f), which applies to a "pending" recognition decision, it noted that the regulation applies to "circumstances *not applicable here*"—*i.e.*, because the Secretary had already reached a final decision. *ACICS*, 303 F. Supp. 3d at 122 (emphasis added). These few references provide weak support, if any, for Defendants' understanding of the Court's decision.

For these reasons, the Court's decision left Secretary King's order intact on remand. Because that order remained in effect, Secretary DeVos's decision to provisionally extend ACICS's recognition was "not in accordance with law" and was "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Moreover, there is only one reasonable way to read the Court's prior decision, and so Secretary DeVos's decision was also "arbitrary and capricious." 5 U.S.C. §§ 706(2)(A). Thus, Count I states a claim under the Administrative Procedure Act.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

Dated: October 14, 2019

Respectfully submitted,

*/s/ John T. Lewis*
John T. Lewis (D.C. Bar No. 1033826)
Jeffrey B. Dubner (D.C. Bar. No. 1013399)
Javier M. Guzman (D.C. Bar No. 462679)
Democracy Forward Foundation
1333 H Street NW
Washington, DC 20005
(202) 448-9090
jlewis@democracyforward.org
jdubner@democracyforward.org
jguzman@democracyforward.org

*/s/ Eric Rothschild*
Eric Rothschild (D.C. Bar No. 1048877)
Alexander S. Elson (D.C. Bar No. 1602459)
National Student Legal Defense Network
1015 15th Street NW, Suite 600
Washington, DC 20005
(202) 734-7495
eric@nsldn.org
alex@nsldn.org

*Counsel for Plaintiffs*